**RIO PROPERTIES, INC.,**
Plaintiff–Appellee,

v.

**RIO INTERNATIONAL INTERLINK,**
Defendant–Appellant.

**Rio Properties, Inc., Plaintiff–Appellee,**

v.

**Rio International Interlink,**
Defendant–Appellant.

Nos. 01–15466, 01–15784.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 17, 2002.

Filed March 20, 2002.

**1012**

Jerome A. DePalma, Las Vegas, Nevada, for the defendant-appellant.

Steve Morris and Denise Michaelides, Morris Pickering & Sanner, Las Vegas, Nevada, David J. Stewart, Alston & Bird, LLP, Atlanta, Georgia, for the plaintiff-appellee.

Before: GOODWIN, SNEED, and TROTT, Circuit Judges.

TROTT, Circuit Judge.

Las Vegas hotel and casino operator Rio Properties, Inc. ("RIO") sued Rio International Interlink ("RII"), a foreign Internet business entity, asserting various statutory and common law trademark infringement claims. The district court entered default judgment against RII for failing to comply with the court's discovery orders. RII now appeals the sufficiency of the service of process, effected via email and regular mail pursuant to Federal Rule of Civil Procedure 4(f)(3), the district court's exercise of personal jurisdiction, and ultimately, the entry of default judgment and the award of attorneys' fees and costs. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's decision.

## BACKGROUND

RIO owns the RIO All Suite Casino Resort, the "Best Hotel Value in the World" according to *Travel and Leisure Magazine*, not to mention the "Best Overall Hotel in Las Vegas," according to the *Zagat Survey of Resorts, Hotels and Spas*. In addition to its elegant hotel, RIO's gambling empire consists of the Rio Race & Sports Book, which allows customers to wager on professional sports. To protect its exclusive rights in the "RIO" name, RIO registered numerous trademarks with the United States Patent and Trademark Office. When RIO sought to expand its presence onto the Internet, it registered the domain name, *www.playrio.com*. At that address, RIO operates a website that informs prospective customers about its hotel and allows those enticed by Lady Luck to make reservations.

RII is a Costa Rican entity that participates in an Internet sports gambling operation, doing business variously as Rio International Sportsbook, Rio Online Sportsbook, or Rio International Sports. RII enables its customers to wager on sporting events online or via a 1–800 telephone number. Far from a penny ante operation, RII grosses an estimated $3 million annually.

RIO became aware of RII's existence by virtue of RII's advertisement in the *Football Betting Guide '98 Preview*. RIO later discovered, in the Nevada edition of the *Daily Racing Form*, another RII advertisement which invited customers to visit RII's website, *www.riosports.com*. RII also ran radio spots in Las Vegas as part of its comprehensive marketing strategy.

Upon learning of RII, RIO fired off an epistle demanding that RII cease and desist from operating the *www.riosports.com* website. Although RII did not formally respond, it promptly disabled the objectionable website. Apparently not ready to cash in its chips, RII soon activated the URL *http://www.betrio.com* to host an identical sports gambling operation. Perturbed, RIO filed the present action alleg-

ing various trademark infringement claims and seeking to enjoin RII from the continued use of the name "RIO."

To initiate suit, RIO attempted to locate RII in the United States for service of process. RIO discovered that RII claimed an address in Miami, Florida when it registered the allegedly infringing domain names. As it turned out, however, that address housed only RII's international courier, IEC, which was not authorized to accept service on RII's behalf. Nevertheless, IEC agreed to forward the summons and complaint to RII's Costa Rican courier.

After sending a copy of the summons and complaint through IEC, RIO received a telephone call from Los Angeles attorney John Carpenter ("Carpenter") inquiring about the lawsuit. Apparently, RII received the summons and complaint from IEC and subsequently consulted Carpenter about how to respond. Carpenter indicated that RII provided him with a partially illegible copy of the complaint and asked RIO to send him a complete copy. RIO agreed to resend the complaint and, in addition, asked Carpenter to accept service for RII; Carpenter politely declined. Carpenter did, however, request that RIO notify him upon successful completion of service of process on RII.

Thus thwarted in its attempt to serve RII in the United States, RIO investigated the possibility of serving RII in Costa Rica. Toward this end, RIO searched international directory databases looking for RII's address in Costa Rica. These efforts proved fruitless however; the investigator learned only that RII preferred communication through its email address, *email@betrio.com,* and received snail mail, including payment for its services, at the IEC address in Florida.

Unable to serve RII by conventional means, RIO filed an emergency motion for alternate service of process. RII opted not to respond to RIO's motion. The district court granted RIO's motion, and pursuant to Federal Rules of Civil Procedure 4(h)(2) and 4(f)(3), ordered service of process on RII through the mail to Carpenter and IEC and via RII's email address, *email@betrio.com.*

Court order in hand, RIO served RII by these court-sanctioned methods. RII filed a motion to dismiss for insufficient service of process and lack of personal jurisdiction. The parties fully briefed the issues, and the district court denied RII's motion without a hearing. RII then filed its answer, denying RIO's allegations and asserting twenty-two affirmative defenses.

As the case proceeded, RIO propounded discovery requests and interrogatories on RII. RIO granted RII two informal extensions of time in which to respond. Nonetheless, RII's eventual responses were almost entirely useless, consisting largely of the answer "N/A," ostensibly meaning "Not Applicable." After additional futile attempts to elicit good faith responses from RII, RIO brought a motion to compel discovery. In granting RIO's motion, the district court warned that in the event RII failed to comply, monetary sanctions would be an insufficient remedy and that "preclusive sanctions" would be awarded. When RII failed to comply with the district court's discovery order, RIO moved for terminating sanctions. Although RII belatedly complied, in part, with RIO's discovery request, the district court granted RIO's motion for sanctions and entered default judgment against RII. Citing RII's reprehensible conduct and bad faith, the district court additionally directed RII to pay reasonable attorneys' fees and costs to RIO in the amount of $88,761.50 and $7,859.52 respectively.

RII now appeals the sufficiency of the court-ordered service of process, the district court's exercise of personal jurisdiction as well as the propriety of the default judgment, and the award of attorneys' fees and costs.

## DISCUSSION

## I  ALTERNATIVE SERVICE OF PROCESS

### A.  Applicability of Rule 4(f)(3)

■ We review for an abuse of discretion the district court's decision regarding the sufficiency of service of process. *Walker v. Sumner*, 14 F.3d 1415, 1422 (9th Cir.1994). Federal Rule of Civil Procedure 4(h)(2)[1] authorizes service of process on a foreign business entity in the manner prescribed by Rule 4(f)[2] for individuals. The subsection of Rule 4(f) relevant to our decision, Rule 4(f)(3),[3] permits service in a place not within any judicial district of the United States "by ... means not prohibit-

ed by international agreement as may be directed by the court."

■ As obvious from its plain language, service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. No other limitations are evident from the text. In fact, as long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country. *See Mayoral–Amy v. BHI Corp.*, 180 F.R.D. 456, 459 n. 4 (S.D.Fla.1998). *But see* Fed.R.Civ.P. 4(f)(2) advisory committee notes (stating that under Rule 4(f)(2), "[s]ervice by methods that would violate foreign law is not generally authorized").

■ RII argues that Rule 4(f) should be read to create a hierarchy of preferred methods of service of process. RII's interpretation would require that a party attempt service of process by those methods enumerated in Rule 4(f)(2), including by

1. Federal Rule of Civil Procedure 4(h) reads, in pertinent part:

   **Service Upon Corporations and Associations.** Unless otherwise provided by federal law, service upon a domestic or foreign corporation or upon a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected:

   (1)....

   (2) in a place not within any judicial district of the United States in any manner prescribed for individuals by subdivision (f) except personal delivery....

2. Federal Rule of Civil Procedure 4(f) provides, in pertinent part:

   **Service Upon Individuals in a Foreign Country.** Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed ... may be effected in a place not within any judicial district of the United States:

(1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention·...; or

(2) if there is no internationally agreed means of service or the applicable international agreement allows other means of service, provided that service is reasonably calculated to give notice:

(A) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or

(B) as directed by the foreign authority in response to a letter rogatory or a letter of request; or

(C)....

(3) by other means not prohibited by international agreement as may be directed by the court.

3. Rule 4(f)(3) was derived from its predecessor, Federal Rule of Civil Procedure 4(i)(1)(E), which provided for alternative service of process in a foreign country "by order of the court."

diplomatic channels and letters rogatory, before petitioning the court for alternative relief under Rule 4(f)(3). We find no support for RII's position. No such requirement is found in the Rule's text, implied by its structure, or even hinted at in the advisory committee notes.

■ By all indications, court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1)[4] or Rule 4(f)(2). *See Forum Fin. Group, LLC v. President & Fellows*, 199 F.R.D. 22, 23–24 (D.Me.2001). Indeed, Rule 4(f)(3) is one of three separately numbered subsections in Rule 4(f), and each subsection is separated from the one previous merely by the simple conjunction "or." Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing. Moreover, no language in Rules 4(f)(1) or 4(f)(2) indicates their primacy, and certainly Rule 4(f)(3) includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means.

The advisory committee notes ("advisory notes") bolster our analysis. Beyond stating that service ordered under Rule 4(f)(3) must comport with constitutional notions of due process and must not be prohibited by international agreement, the advisory notes indicate the availability of alternate service of process under Rule 4(f)(3) without first attempting service by other means. Specifically, the advisory notes suggest that in cases of "urgency," Rule 4(f)(3) may allow the district court to order a "special method of service," even if other methods of service remain incomplete or unattempted.

■ Thus, examining the language and structure of Rule 4(f) and the accompanying advisory committee notes, we are left with the inevitable conclusion that service of process under Rule 4(f)(3) is neither a "last resort" nor "extraordinary relief." *Forum Fin. Group*, 199 F.R.D. at 23. It is merely one means among several which enables service of process on an international defendant.

■ RII argues that *Graval v. P.T. Bakrie & Bros.*, 986 F.Supp. 1326, 1330 (C.D.Cal.1996), requires attempted service by other methods, including through diplomatic channels or letters rogatory, before resort to court-ordered service under Rule 4(f)(3). The court in *Graval* believed that Rule 4(f)(3) was "intended as a last resort, only to be employed when there are no other feasible alternatives." *Id.* Yet, the court in *Graval* erroneously based this belief on an advisory committee note pertaining solely to Rule 4(f)(2),[5] which simply does not apply to Rule 4(f)(3). *Id.* Indeed, *Graval*'s interpretation of Rule 4(f) is indefensible; it is unsupported by Rule 4(f)'s

---

**4.** A federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention referenced in Rule 4(f)(1). The parties agree, however, that the Hague Convention does not apply in this case because Costa Rica is not a signatory.

**5.** The *Graval* Court quoted the advisory committee notes for Rule 4(f)(2) as follows:

Service by methods that would violate foreign law is not generally authorized. Subparagraphs (A) [which provides for service in the manner prescribed by the foreign law] and (B)[which provides for service as directed by the foreign authority in response to a letter rogatory or letter of request] prescribe the more appropriate methods for conforming to local practice or using local authority.

*Graval*, 986 F.Supp. at 1330. Yet the *Graval* Court did not realize that this advisory committee note speaks only about subparagraphs (A) and (B) *of Rule 4(f)(2)*. *See Forum Fin. Group*, 199 F.R.D. at 24 n. 3. The advisory committee notes pertaining to Rule 4(f)(3) suggest no such limitation.

language and structure or by any proper reading of the advisory committee notes. Nor does any other case interpreting Rule 4(f)(3) or its predecessor endorse *Graval*'s interpretation. Thus, we disapprove of the statements in *Graval* which would require attempted service by all feasible alternatives before service under Rule 4(f)(3) is allowed. Instead, we hold that Rule 4(f)(3) is an equal means of effecting service of process under the Federal Rules of Civil Procedure, and we commit to the sound discretion of the district court the task of determining when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3).

Applying this proper construction of Rule 4(f)(3) and its predecessor, trial courts have authorized a wide variety of alternative methods of service including publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, telex, and most recently, email. *See SEC v. Tome*, 833 F.2d 1086, 1094 (2d Cir.1987) (condoning service of process by publication in the *Int'l Herald Tribune*); *Smith v. Islamic Emirate*, Nos. 01 Civ. 10132, 01 Civ. 10144, 2001 WL 1658211, at *2–*3, 2001 U.S. Dist. LEXIS 21712, at *5–*13 (S.D.N.Y. Dec. 26, 2001) (authorizing service of process on terrorism impresario Osama bin Laden and al-Qaeda by publication); *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537, 541–44 (S.D.N.Y.1965) (employing service by ordinary mail); *Int'l Controls Corp. v. Vesco*, 593 F.2d 166, 176–78 (2d Cir.1979) (approving service by mail to last known address); *Forum Fin. Group*, 199 F.R.D. at 23–24 (authorizing service to defendant's attorney); *New Eng. Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F.Supp. 73, 80 (S.D.N.Y. 1980) (allowing service by telex for Iranian defendants); *Broadfoot v. Diaz (In re Int'l Telemedia Assoc.)*, 245 B.R. 713, 719–20

(Bankr.N.D.Ga.2000) (authorizing service via email).

■ In this case, RIO attempted to serve RII by conventional means in the United States. Although RII claimed an address in Florida, that address housed only IEC, RII's international courier, which refused to accept service of process on RII's behalf. RII's attorney, Carpenter, who was specifically consulted in this matter, also declined to accept service of process. RIO's private investigator subsequently failed to discover RII's whereabouts in Costa Rica. Thus unable to serve RII, RIO brought an emergency motion to effectuate alternative service of process.

Contrary to RII's assertions, RIO need not have attempted every permissible means of service of process before petitioning the court for alternative relief. Instead, RIO needed only to demonstrate that the facts and circumstances of the present case necessitated the district court's intervention. Thus, when RIO presented the district court with its inability to serve an elusive international defendant, striving to evade service of process, the district court properly exercised its discretionary powers to craft alternate means of service. We expressly agree with the district court's handling of this case and its use of Rule 4(f)(3) to ensure the smooth functioning of our courts of law.

**B. Reasonableness of the Court Ordered Methods of Service**

■ Even if facially permitted by Rule 4(f)(3), a method of service of process must also comport with constitutional notions of due process. To meet this requirement, the method of service crafted by the district court must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v.*

*Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (Jackson, J.).

Without hesitation, we conclude that each alternative method of service of process ordered by the district court was constitutionally acceptable. In our view, each method of service was reasonably calculated, under these circumstances, to apprise RII of the pendency of the action and afford it an opportunity to respond.

■ In particular, service through IEC was appropriate because RII listed IEC's address as its own when registering the allegedly infringing domain name. The record also reflects that RII directed its customers to remit payment to IEC's address. Moreover, when RIO sent a copy of the summons and complaint to RII through IEC, RII received it. All told, this evidence indicates that RII relied heavily upon IEC to operate its business in the United States and that IEC could effectively pass information to RII in Costa Rica.

■ Service upon Carpenter was also appropriate because he had been specifically consulted by RII regarding this lawsuit. He knew of RII's legal positions, and it seems clear that he was in contact with RII in Costa Rica. Accordingly, service to Carpenter was also reasonably calculated in these circumstances to apprise RII of the pendency of the present action.

■ Finally, we turn to the district court's order authorizing service of process on RII by email at *email@betrio.com*. We acknowledge that we tread upon untrodden ground. The parties cite no authority condoning service of process over the Internet or via email, and our own investigation has unearthed no decisions by the United States Courts of Appeals dealing with service of process by email and only one case anywhere in the federal courts.

Despite this dearth of authority, however, we do not labor long in reaching our decision. Considering the facts presented by this case, we conclude not only that service of process by email was proper—that is, reasonably calculated to apprise RII of the pendency of the action and afford it an opportunity to respond—but in this case, it was the method of service most likely to reach RII.

■ To be sure, the Constitution does not require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond. *See Mullane*, 339 U.S. at 314, 70 S.Ct. 652. In proper circumstances, this broad constitutional principle unshackles the federal courts from anachronistic methods of service and permits them entry into the technological renaissance. As noted by the court in *New England Merchants*, in granting permission to effect service of process via telex on Iranian defendants:

> Courts ... cannot be blind to changes and advances in technology. No longer do we live in a world where communications are conducted solely by mail carried by fast sailing clipper ... ships. Electronic communication via satellite can and does provide instantaneous transmission of notice and information. No longer must process be mailed to a defendant's door when he can receive complete notice at an electronic terminal inside his very office, even when the door is steel and bolted shut.

495 F.Supp. at 81. We agree wholeheartedly.

Although communication via email and over the Internet is comparatively new, such communication has been zealously embraced within the business community. RII particularly has embraced the modern e-business model and profited immensely

from it. In fact, RII structured its business such that it could be contacted *only* via its email address. RII listed no easily discoverable street address in the United States or in Costa Rica. Rather, on its website and print media, RII designated its email address as its preferred contact information.

Unlike the Iranian officials in *New England Merchants*, RII had neither an office nor a door; it had only a computer terminal. If any method of communication is reasonably calculated to provide RII with notice, surely it is email—the method of communication which RII utilizes and prefers. In addition, email was the only court-ordered method of service aimed directly and instantly at RII, as opposed to methods of service effected through intermediaries like IEC and Carpenter. Indeed, when faced with an international e-business scofflaw, playing hide-and-seek with the federal court, email may be the only means of effecting service of process. Certainly in this case, it was a means reasonably calculated to apprise RII of the pendency of the lawsuit, and the Constitution requires nothing more.

▉▉ Citing *WAWA, Inc. v. Christensen*, No. 99–1454, 1999 WL 557936, at *1, 1999 U.S. Dist. LEXIS 11510, at *4 (E.D.Pa. July 29, 1999) (unpublished), RII contends that email is never an approved

method of service under Rule 4.[6] We disagree. In *WAWA*, the plaintiff attempted to serve the defendant via email absent a court order. Although RII is correct that a plaintiff may not generally resort to email service on his own initiative, in this case, as in *International Telemedia Associates*, email service was properly ordered by the district court using its discretion under Rule 4(f)(3).

Despite our endorsement of service of process by email in this case, we are cognizant of its limitations. In most instances, there is no way to confirm receipt of an email message. Limited use of electronic signatures[7] could present problems in complying with the verification requirements of Rule 4(a) and Rule 11, and system compatibility problems may lead to controversies over whether an exhibit or attachment was actually received. Imprecise imaging technology may even make appending exhibits and attachments impossible in some circumstances. We note, however, that, except for the provisions recently introduced into Rule 5(b), email service is not available absent a Rule 4(f)(3) court decree. Accordingly, we leave it to the discretion of the district court to balance the limitations of email service against its benefits in any particular case. *See Mayoral–Amy*, 180 F.R.D. at 460 (declining to authorize alternative service under Rule 4(f)(3)). In our case, the district

---

**6.** As of December 1, 2001, amended Federal Rules of Civil Procedure 5(b)(2)(D) and 5(b)(3) permit service of process by email in certain circumstances:

> Service under Rule 5(a) is made by:
> D) Delivering a copy by any other means, including electronic means, consented to in writing by the person served. Service by electronic means is complete on transmission; service by other consented means is complete when the person making service delivers the copy to the agency designated to make delivery. If authorized by local rule, a party may make service under this

> subparagraph (D) through the court's transmission facilities.
> (3) Service by electronic means under Rule 5(b)(2)(D) is not effective if the party making service learns that the attempted service did not reach the person to be served.

**7.** The term "Electronic Signature" is defined in 15 U.S.C. § 7006 as:

> [A]n electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record.

court performed the balancing test admirably, crafting methods of service reasonably calculated under the circumstances to apprise RII of the pendency of the action.[8]

## II  JURISDICTION

■■■■ The district court's determination that personal jurisdiction can be exercised is a question of law reviewed de novo. *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1319–20 (9th Cir.1998). Although the defendant is the moving party on a motion to dismiss, the plaintiff bears the burden of establishing that jurisdiction exists. *See KVOS, Inc. v. Assoc. Press,* 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936). Where, as here, the district court receives only written submissions, the plaintiff need only make a prima facie showing of jurisdiction to avoid the defendant's motion to dismiss. *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 268 (9th Cir.1995); *Data Disc, Inc. v. Sys. Tech. Assocs.,* 557 F.2d 1280, 1285 (9th Cir.1977). In determining whether RIO has met this burden, uncontroverted allegations in RIO's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in RIO's favor. *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996).

■■■■ To establish that personal jurisdiction over RII is proper, RIO must show that (1) Nevada's long-arm statute confers personal jurisdiction over RII; and (2) that the exercise of jurisdiction comports with the constitutional principles of due process. *See Omeluk,* 52 F.3d at 269. Nevada's long-arm statute permits the exercise of jurisdiction to the same extent as the Constitution. Nev.Rev.Stat. § 14.065 (2001). Hence, we consider only

the constitutional principles of due process which require that RII have minimum contacts with Nevada "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■■■■ General jurisdiction is not at issue on appeal; we consider only whether the district court properly exercised specific jurisdiction over RII. A three-part test dictates whether specific jurisdiction can be exercised over the defendant: (1) RII must have performed some act or consummated some transaction with the forum by which it purposefully availed itself of the privilege of conducting business in Nevada; (2) RIO's claims must arise out of or result from RII's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Haisten v. Grass Valley Med. Reimbursement Fund,* 784 F.2d 1392, 1397 (9th Cir.1986).

### A.  Purposeful Availment

■■■■ The purposeful availment requirement ensures that a non-resident defendant will not be haled into court based upon random, fortuitous, or attenuated contacts with the forum state. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. A non-resident defendant purposefully avails itself of the forum if its contacts with the forum are attributable to (1) intentional acts; (2) expressly aimed at the forum; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum. *See Calder v. Jones,* 465 U.S. 783, 788–89, 104

---

8.  Notably, RII does not argue that it did not receive notice of the present lawsuit or that such notice was incomplete, delayed or in any way prejudicial to its ability to respond effectively and in a timely manner.

S.Ct. 1482, 79 L.Ed.2d 804 (1984) (establishing an "effects doctrine" for intentional action aimed at the forum); *Core Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1485–86 (9th Cir.1993).

In *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418–20 (9th Cir.1997), we considered the exercise of specific jurisdiction over a website advertiser. The website advertiser had done nothing other than register a domain name and post an essentially passive website. Certainly, it had done nothing to encourage residents of the forum state to access its site. *See id.* at 419. We held that these acts were insufficient to confer jurisdiction over a nonresident defendant. The objectionable webpage "simply was not aimed intentionally at[the forum state] knowing that harm was likely to be caused there." *Id.* at 420. Under the effects doctrine, "something more" was required to indicate that the defendant purposefully directed its activity in a substantial way to the forum state. *Id.* at 418.

In *Panavision,* 141 F.3d at 1322, Toeppen, a cybersquatter, registered and posted a passive website at *www.panavision.com.* Toeppen then sent letters to Panavision demanding $13,000 in return for the hijacked domain name. By sending these letters into California, Toeppen evinced knowledge that his cybersquatting injured Panavision in California—Panavision's principal place of business and the epicenter of the movie and television industry. Looking beyond Toeppen's passive website, we found that his letters directly targeted the forum, and thus, constituted the requisite "something more" necessary to authorize the exercise of personal jurisdiction. *Id.; see also Sinatra v. Nat'l Enquirer, Inc.,* 854 F.2d 1191, 1195 (9th Cir.1988) (exercising personal jurisdiction over a Swiss Clinic that misappropriated Frank Sinatra's name through a series of advertisements aimed at California residents and thereby caused injury in California).

■ Here, the district court ruled on RII's motion to dismiss for lack of jurisdiction after receiving only written submissions, including pleadings and affidavits. RIO was thus charged with making a prima facie showing of facts that might establish personal jurisdiction by a preponderance of the evidence.

RIO alleged that RII operated a website that "allows customers throughout the United States and the world to place wagers on sporting events." RII responded that merely operating an Internet advertisement or a passive website cannot confer personal jurisdiction. While RII's assertion may be true, *see Panavision,* 141 F.3d at 1322; *Cybersell,* 130 F.3d at 418, operating even a passive website in conjunction with "something more"—conduct directly targeting the forum—is sufficient to confer personal jurisdiction. *Panavision,* 141 F.3d at 1322.

Here, RIO sufficiently alleged that RII engaged in "something more" than the operation of a passive website. In its complaint, RIO alleged that RII "specifically targeted consumers" in Nevada "by running radio and print advertisements in Las Vegas." In particular, RIO alleged that RII advertised in the *Football Betting Guide '98 Preview* and the *Daily Racing Form.* In fact, RIO attached to its complaint a copy of RII's print advertisement from the Nevada edition of the *Daily Racing Form.* Clearly, RII knowingly injured RIO in Nevada—its principal place of business and the capital of the gambling industry. All told, RII's actions in Nevada, including its radio and print advertisements, demonstrate an insistent marketing campaign directed toward Nevada. Therefore, we have no problem finding that under the effects doctrine, the pur-

poseful availment requirement for the exercise of personal jurisdiction is satisfied.[9]

## B. RII's Forum Related Activities

The second requirement for specific jurisdiction is that RIO's claim arise out of RII's Nevada-related activities. This requirement is satisfied if RIO would not have been injured "but for" RII's conduct in Nevada. *Panavision*, 141 F.3d at 1322. In *Panavision*, this requirement was satisfied where Toeppen's domain name registration of Panavision's trademark had the effect of injuring Panavision in California, its home state and the capital of the movie industry. *Id.*

Here, RII's maintenance and promotion of a gambling website injured RIO in Nevada, its principal place of business and the capital of the gambling industry. In addition, RII specifically competed with RIO in Nevada by targeting Nevada consumers in radio and print media. But for RII's activities in Nevada, RIO's injury would not have occurred. Thus, under the effects doctrine, the second requirement for the exercise of personal jurisdiction is satisfied.

## C. Reasonableness

■ The exercise of jurisdiction is reasonable if it comports with traditional notions of fair play and substantial justice. In determining reasonableness, seven factors are considered: (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *See Core–Vent*, 11 F.3d at 1488. As no single factor is dispositive, a court must balance all seven. *See id.* at 1488.

RII has purposefully interjected itself into Nevada, and although RII may be burdened by defending in Nevada, it would be so burdened defending in any judicial district in the United States. RII addresses no germane conflict that exists between the United States and Costa Rica. Moreover, as the gambling center of the United States and home of RIO, Nevada asserts a strong interest in adjudicating RIO's claims, and with its expertise resolving disputes involving gambling entities, Nevada can most efficiently resolve the dispute. It is also convenient for RIO to litigate in Nevada, its principal place of business and the location of many pertinent documents. Finally, we note that RII suggests no alternative forum, nor can we conceive of one. In sum, the factors weigh overwhelmingly in favor of the reasonable exercise of personal jurisdiction over RII.

## III  ENTRY OF DEFAULT JUDGMENT

■ The district court entered default judgment against RII pursuant to Federal Rule of Civil Procedure 37(b)(2)(C)[10] for

---

9. In its reply brief, RII asserts that "RIO ... fails to advise the Court the allegation [that RII had contacts with Nevada] ... was found to be false through discovery." Apparently, RII answered several discovery interrogatories disclaiming any contact whatsoever with Nevada. If this case had proceeded, RIO would have borne the burden of proving facts sufficient to establish personal jurisdiction, including the extent to RII's Nevada business contacts. On the face of the complaint, however, RIO easily established a prima facie showing that RII purposefully availed itself of the Nevada forum.

10. Federal Rule of Civil Procedure 37(b)(2)(C) provides in pertinent part:

its willful and deliberate failure to comply with discovery orders. We review for an abuse of discretion the district court's decision under Rule 37, and we will overturn a dismissal sanction only with a definite conviction that it was clearly outside the acceptable range of sanctions. *Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1385 (9th Cir.1988).

A district court should consider five factors before imposing the sanction of dismissal: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *See id.* (citation omitted). If the district court does not explicitly consider these five factors, we may review the record independently in order to ascertain whether the district court abused its discretion. *See Malone v. United States Postal Serv.*, 833 F.2d 128, 130 (9th Cir.1987).

In *Toth*, the district court premised dismissal on the plaintiff's persistent refusal to comply with discovery requests, despite repeated court orders to respond. 862 F.2d at 1385. Although the district court in *Toth* did not explicitly consider the relevant factors before dismissing the case, we found that the factors of expeditious resolution of litigation, docket management, and prejudice weighed in favor of dismissal. *Id.*

As in *Toth*, here, the factors of expeditious resolution of litigation, docket management, and prejudice weigh in favor of dismissal. Additionally though, the dis-

trict court, which is part of a district with numerous vacancies and a huge caseload, expressly considered the availability and efficacy of less drastic sanctions (and determined them futile in dealing with an impudent international defendant) before entering default judgment. Cognizant of RII's repeated attempts to evade service of process, the district court expressly warned RII that failure to comply with its discovery order would lead to "preclusive sanctions or other sanctions in terms of the relief that are [sic] being sought by plaintiffs." RII's counsel even conceded that if RII did not "comply with th[e] Order of the Court, ... this Court has the ability to do any number of things, strike a defense [or] strike an answer." While the public policy favoring disposition of cases on their merits weighs against default judgment, that single factor is not enough to preclude imposition of this sanction when the other four factors weigh in its favor.

RII presents sundry equitable arguments to escape the wrath of default judgment. We have contemplated those arguments and reject them. Considering RII's multiple transgressions during each phase of the litigation, we conclude that the district court acted within its discretion in entering default judgment.

## IV ATTORNEYS' FEES AND COSTS

An award of reasonable attorneys' fees and costs is expressly provided for in "exceptional cases" of trademark infringement. 15 U.S.C. § 1117(a) (2001); *see also* Fed.R.Civ.P. 54(d). As part of the default judgment, the district court award-

---

**Sanctions by Court in Which Action is Pending.** If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

**(C)** An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]

ed RIO reasonable attorneys' fees and costs after determining RII acted willfully and in bad faith. We review this fee award for an abuse of discretion. *Gracie v. Gracie*, 217 F.3d 1060, 1071–72 (9th Cir.2000).

■■■ RII argues that the award of attorneys' fees was improper because the district court made no findings that this case was "exceptional." While the term "exceptional" is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful. *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir.1982). In this case, by entry of default judgment, the district court determined, as alleged in RIO's complaint, that RII's acts were committed "knowingly, maliciously, and oppressively, and with an intent to . . . injure RIO." *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir.1987) (holding that upon entry of default judgment, the factual allegations of the complaint are deemed true). We cannot say that this award of attorneys' fees and costs was an abuse of discretion.

■■■ RII further argues that the actual award of fees and costs was excessive or duplicative. In particular, RII argues that the district court erroneously awarded fees for staff personnel other than attorneys. On this score, the district court did not err; these costs are recoverable. *See Missouri v. Jenkins*, 491 U.S. 274, 288, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

RII also cries foul with respect to multifarious other items including, the attorneys' billing rate, the number of hours expended, duplicative billing, and travel expenses. Yet we conclude that in awarding recovery for each of these items, the district court did not abuse its discretion.

## CONCLUSION

For the reasons delineated above, we affirm the district court's decision in all respects.

AFFIRMED.